## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

ASPEN SPECIALTY INSURANCE
COMPANY,

        Plaintiff/Counterclaim Defendant,

    v.

JEFFREY JARWRI DORMU, D.O., and
MINIMALLY INVASIVE VASCULAR
CENTER, LLC,

        Defendants/Counterclaim Plaintiffs/
        Third Party Plaintiffs,

    v.

THE MEDICAL PROTECTIVE COMPANY,

        Third-Party Defendant.

Civil Action No. TDC-22-0791

## MEMORANDUM OPINION

Plaintiff Aspen Specialty Insurance Company ("Aspen") has filed this civil action against Defendants Dr. Jeffrey Dormu and Minimally Invasive Vascular Center, LLC ("MIVC") seeking a declaratory judgment that Aspen has no duty to defend or indemnify Defendants in a medical malpractice action brought by a former patient of Dr. Dormu. Defendants have filed a Counterclaim against Aspen and a Third Party Complaint against another insurance company, Third Party Defendant the Medical Protective Company ("MedPro"), seeking declaratory judgments that Aspen, MedPro, or both are obligated to defend and indemnify Defendants in the underlying medical malpractice case. Aspen has filed a Motion for Judgment on the Pleadings on its claim, and MedPro has filed a Motion to Dismiss the Third Party Complaint. Both Motions are

fully briefed, and a hearing was held on August 28, 2023. For the reasons set forth below, Aspen's

Motion will be GRANTED, and MedPro's Motion will be DENIED.

**BACKGROUND**

Dr. Dormu is a surgeon specializing in vascular surgery and general surgery who has

operated MIVC in Laurel, Maryland since 2008. On October 9, 2007, Dr. Dormu purchased a

professional liability insurance policy from MedPro ("the MedPro Policy"), through which both

he and MIVC were insured through October 9, 2021. For the time period after October 9, 2021,

Dr. Dormu and MIVC secured a professional liability insurance policy from Aspen ("the Aspen

Policy").

## I.    The MedPro Policy

The MedPro Policy, which was in effect from October 9, 2007 to October 9, 2021, provided

professional liability insurance to Dr. Dormu and MIVC, referred to in the Policy as the "Insureds,"

and thus provided coverage and required MedPro to defend against any claim for damages, with

certain enumerated exceptions not relevant here, based upon the professional services provided by

Dr. Dormu or MIVC on or after October 9, 2007, referred to as the "retroactive date." Am.

Countercl. & Third Party Compl. ("Am. Countercl.") ¶ 35, ECF No. 59; MedPro Policy at 4, 30,

Am. Countercl. Ex. 8, ECF 59-8.[1] The MedPro Policy was a "claims made" policy under which

MedPro agreed to provide coverage for "any claim first made, or potential claim first brought to

the Insured's attention, during the term of this policy based upon professional services rendered[.]"

MedPro Policy at 22. As defined in the MedPro Policy, a "claim" is "an express written demand

for money as compensation for civil damages." *Id.* at 23. A "potential claim" is "an incident

---

[1]    The page numbers of the MedPro Policy and the Aspen Policy cited in this opinion are the page
numbers assigned by the Court's CM/ECF electronic docketing system.

which the Insured reasonably believes will result in a claim for damages." *Id.* "First made" as used in the MedPro Policy means "the date the Insured initially received the claim for damages." *Id.*

Based on the terms of the MedPro Policy, MedPro had no duty to defend or pay damages on a claim unless the claim "was reported to [MedPro] during the term of [the] policy or thirty (30) days thereafter." *Id.* at 22. MedPro required that any potential claim be reported to MedPro "during the term of this policy" and that any report of a potential claim include all "reasonably obtainable information" about the underlying incident. *Id.*

Defendants renewed the MedPro Policy on October 9, 2020 for a term of one year running from October 9, 2020 to October 9, 2021. On August 16, 2021, however, MedPro notified Defendants that for business reasons unrelated to Dr. Dormu's practice, it would decline to renew coverage at the end of the current policy period, which would occur on October 9, 2021. MedPro advised Defendants that to provide insurance coverage for any later filed claims based on services rendered from October 9, 2007 to the expiration of the MedPro Policy, they could purchase from MedPro an extension contract, which would extend the time for reporting claims beyond the 30-day period following the expiration of the policy already provided for in the MedPro Policy, or they could obtain a new claims-made policy from another company that would cover newly reported claims arising from services dating back to the retroactive date of October 9, 2007. Defendants opted to obtain a new claims-made policy.

## II.    The Aspen Policy

On September 17, 2021, Defendants submitted an application to Aspen for a professional liability insurance policy seeking coverage for services provided on or after October 9, 2007. The application was approved, and Defendants secured the Aspen Policy, which was a "claims made

3

and reported" policy with an effective date of October 9, 2021, the date of the expiration of the MedPro Policy, and continuing until October 9, 2022. The retroactive date, as with the MedPro Policy, was October 9, 2007.

The Aspen Policy provides that Aspen will "pay on your behalf all sums you become legally obligated to pay as damages as a result of a claim or suit first made against you . . . and reported to us during the policy period because of an injury caused by an incident," provided that:

a. Any incident must occur on or after the retroactive date and before the end of the policy period.

b. Prior to the inception of this policy, no insured had a reasonable basis to believe: (1) that a professional duty had been breached; or (2) that an incident might reasonably be expected to be the basis of a claim or suit against any insured;

c. You report the claim immediately but in no event later than thirty (30) [days] after you first become aware of such claim or the end of the policy period whichever is sooner; and

d. An insured receives a written demand for money or services.

Aspen Policy at 9, Am. Countercl. Ex. 9, ECF No. 59-9. Under the Aspen Policy, a "claim" is "a demand for money or services" received by the Insured alleging an "injury caused by an incident to which the insurance applies." *Id.* at 21. A "claim" may also consist of "an incident that [the Insureds] report to [Aspen], which [the Insureds] reasonably believe may result in a demand for money or services." *Id.* An "incident" is "any act, error, or omission, or misstatement or misleading statement" by the Insured "in the rendering of or failure to render professional services," but an incident is not deemed to be a "claim" unless there is a "written demand for money or services." *Id.* at 8.

The Aspen Policy has certain coverage exclusions, including, as relevant here, Exclusions E and F. Exclusion E (the "Prior Knowledge Exclusion") provides that no coverage is available for a claim that "in any way involves . . . [a]ny incident which, prior to the inception of this policy, any insured had a reasonable basis to believe: (1) that a professional duty had been breached; or

4

(2) that an incident might reasonably be expected to be the basis of a claim or suit against any insured[.]" *Id.* at 11. Exclusion F (the "Medical Records Exclusion") states that no coverage is available for any "claim or suit brought by a patient where, prior to the inception of this policy, a patient or a legal representative of a patient requested the patient's medical records from [the Insured] or [the Insured's] medical practice." *Id.*

### III.  The Terry Action

On August 13, 2020, Linda Louise Terry went to MIVC to receive treatment from Dr. Dormu for peripheral vascular disease and non-healing ulcers.  According to Dr. Dormu, he determined that she was experiencing septic shock, so he called for an ambulance to take her to the hospital.  He asserts that contrary to his instructions, the emergency medical personnel took Terry to her nursing home rather than the hospital.  Although the nursing home called another ambulance to have her taken to the hospital, Terry died later that day.

On April 20, 2021, an attorney for Terry's estate ("the Terry Estate") sent a letter to MIVC requesting medical records relating to the treatment of Terry by Dr. Dormu and MIVC (the "Terry Medical Records Request").  Asserting that MIVC had previously refused to provide the relevant records, the attorney stated in the letter, in part, "Your refusal to produce the medical records as requested is a violation of Maryland law, which requires health care providers to produce patient medical records upon request of an interested party within a 'reasonable' time, but not to exceed 21 days."  Terry Med. Records Request at 1, Am. Comp. Ex. B, ECF No. 44-2.  The letter further stated:

> If you do not produce the medical records requested by my office by close of business this week, my clients will take all appropriate legal action to enforce their rights under Maryland and federal law and hold you accountable for violation of the law.  Moreover, please be on notice of possible litigation and your duty to preserve all documents (including electronic data, audit trails, etc.) concerning Ms. Terry *in addition to* your handling of our medical records request.

5

*Id.*

On August 26, 2021, the Terry Estate filed a Statement of Claim against Dr. Dormu and MIVC with the Health Care Alternative Dispute Resolution Office of the Circuit Court for Prince George's County, Maryland ("HCADRO"). By law, the Director of the HCADRO is required to have the Statement of Claim served on the health care provider that is the subject of claim. *See* Md. Code Ann., Cts. & Jud. Proc. § 3-2A-04(a)(1)(ii) (LexisNexis 2020). Accordingly, Defendants assert that the HCADRO mailed the Statement of Claim to the MIVC office.

On September 27, 2021, the Terry Estate filed a civil action for wrongful death ("the Terry Action") against Defendants in the Circuit Court for Prince George's County. On or about October 12, 2021, the Terry Action complaint and summons was served at Dr. Dormu's residence and received by Dr. Dormu's brother, who gave the documents to Dr. Dormu later that week. MIVC was served on October 14, 2021.

On October 19, 2021, MIVC submitted the Terry Action claim to MedPro through MIVC's insurance broker. During a phone call on October 27, 2021, a MedPro representative told Aiden Dart, Chief Operating Officer of MIVC, that because Defendants were served with the Terry Action after the end of the MedPro policy period, MedPro would not provide insurance coverage. In a letter dated November 1, 2020, MedPro formally denied coverage on the grounds that the claim was made by the Terry Estate, and reported to MedPro by Defendants, after the expiration of the MedPro Policy.

On October 28, 2021, Defendants reported and submitted the Terry Action claim to Aspen through the insurance broker. Though Aspen initially agreed to defend Defendants in the Terry Action, subject to a reservation of rights, Aspen revoked its agreement and filed its Complaint in

6

the present action seeking a declaratory judgment that it has no duty to defend or indemnify under the Aspen Policy.

## IV.    Procedural History

Aspen filed its initial Complaint against Defendants on April 1, 2022 and its Amended Complaint on August 12, 2022.  In its Amended Complaint, Aspen argues that the Aspen Policy does not provide coverage for the Terry Action because Defendants received the Terry Medical Records Request prior to the inception date of the Aspen Policy, so the Medical Records Exclusion applies to exclude coverage.  Among other additional arguments, Aspen also asserts that coverage is barred by the Prior Knowledge Exclusion, because Defendants' receipt of the Terry Medical Records Request gave them a reasonable basis to believe that Dr. Dormu's treatment of Terry on August 13, 2020 would be the basis of a claim or lawsuit against them.

On October 27, 2022, Defendants filed the present Amended Counterclaim and Third Party Complaint against Aspen and MedPro.  In Count 1, Defendants assert a counterclaim against Aspen seeking a declaratory judgment that the Aspen Policy creates a duty to defend and indemnify Defendants against the claims made in the Terry Action because the Terry Action was served on Dr. Dormu during the policy period and was timely reported to Aspen.  In Count 2, Defendants assert a third-party claim against MedPro seeking, in the alternative, a declaratory judgment that MedPro has a duty under the MedPro Policy to defend and indemnify Defendants against the claims made in the Terry Action on the grounds that the timing of the filing of the Terry Action and reporting of it to MedPro established coverage, the Terry Medical Records Request constituted either an actual or potential claim first made during the period of the MedPro Policy, and the Statement of Claim filed with the HCADRO on August 26, 2021 constituted a claim first made during the policy period that was timely reported to MedPro.

## DISCUSSION

Aspen has filed a Motion for Judgment on the Pleadings under Federal Rule of Civil Procedure 12(c). In its Motion, Aspen argues that there is no coverage for the Terry Action under the Aspen Policy because (1) the April 20, 2021 Terry Medical Records Request precludes coverage under the Aspen Policy pursuant to Exclusion F, the Medical Records Exclusion; and (2) coverage is unavailable based on Exclusion E, the Prior Knowledge Exclusion, because Defendants had a reasonable basis to believe that Dr. Dormu's treatment of Terry could "reasonably be expected to be the basis of a claim or suit against" them. Aspen Policy at 11.

Separately, MedPro has filed a Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6). MedPro argues that it has no duty to defend or indemnify under the terms of the MedPro Policy because the Terry Action claim was not "first made" during its policy period. MedPro Mot. Dismiss at 8, ECF No. 61-1. More specifically, MedPro asserts that, under the MedPro Policy, neither the April 20, 2021 Terry Medical Records Request nor the August 26, 2021 HCADRO Statement of Claim constitutes a claim or a potential claim made during the policy period as required to establish coverage under the MedPro Policy.

## I.    Legal Standards

### A.    Motion to Dismiss

To defeat a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual

8

allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005). In considering a Rule 12(b)(6) motion, the Court considers the operative complaint and any attachments to the pleading, but it may also consider documents attached to the motion if they are "integral to the complaint and authentic." *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007).

### B.     Motion for Judgment on the Pleadings

Federal Rule of Civil Procedure 12(c) provides that "a party may move for judgment on the pleadings" after the pleadings have been filed. Fed. R. Civ. P. 12(c). On such a motion, the court considers the pleadings and any attachments to those filings, as well as any documents submitted with the motion that are "integral to the complaint and authentic." *Occupy Columbia v. Haley*, 738 F.3d 107, 116 (4th Cir. 2013) (quoting *Phillips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)).

In resolving a Rule 12(c) motion, the court applies the same standard applicable to a motion to dismiss under Rule 12(b)(6). *Pulte Home Corp. v. Montgomery Cnty.*, 909 F.3d 685, 691 (4th Cir. 2018). A Rule 12(c) motion is properly granted if "it appears certain that the plaintiff cannot prove any set of facts in support of [its] claim entitling it to relief." *Id.* (quoting *Priority Auto. Grp., Inc. v. Ford Motor Co.*, 757 F.3d 137, 139 (4th Cir. 2014). Such a motion can be used to obtain a declaratory judgment where the only dispute is the proper interpretation of contractual terms. *See Hous. Auth. Risk Retention Grp., Inc. v. Chi. Hous. Auth.*, 378 F.3d 596, 598 (7th Cir. 2004); *A. S. Abell Co. v. Balt. Typographical Union No. 12*, 338 F.2d 190, 193-95 (4th Cir. 1964).

## C.    Contract Interpretation

Both Motions center on the interpretation of contracts, the MedPro Policy and the Aspen Policy. Under Maryland law, which applies to these disputes, courts "do[] not follow the rule that insurance policies are to be most strongly construed against the insurer." *Cap. City Real Est., LLC v. Certain Underwriters at Lloyd's London, Subscribing to Policy Number: ARTE018240*, 788 F.3d 375, 379 (4th Cir. 2015) (quoting *Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.*, 699 A.2d 482, 494 (Md. 1997)). Rather, courts apply "ordinary contract principles to insurance contracts." *Id.* Under Maryland contract principles, a court should "accord a word its usual, ordinary and accepted meaning" unless there is evidence that the parties intended "to employ it in a special or technical sense." *Cheney v. Bell Nat'l Life Ins. Co.*, 556 A.2d 1135, 1138 (Md. 1989). "[T]he intention of the parties is to be ascertained if reasonably possible from the policy as a whole." *Id.* If the insurance contract is unambiguous, the contract is construed based on the language alone. *See Cap. City Real Est., LLC*, 788 F.3d at 379. Where a contract is ambiguous, "extrinsic and parol evidence may be considered." *Cheney*, 556 A.2d at 1138. However, if the introduction of extrinsic evidence does not resolve the ambiguity, the insurance contract is "construed against the insurer as drafter of the instrument." *Id.*

Maryland courts apply a two-part test to determine if an insurer has a duty to defend. First, the court must determine "what is the coverage and what are the defenses under the terms and requirements of the insurance policy[.]" *St. Paul Fire & Marine Ins. Co. v. Pryseski*, 438 A.2d 282, 285 (Md. 1981). Second, the court reviews the allegations of the underlying suit to determine whether they "potentially bring the tort claim within the policy's coverage." *Id.* In examining the coverage and defenses available under the policy, a court must construe the contract "as a whole and give effect to every clause and phrase." *Harleysville Preferred Ins. Co. v. Rams Head Savage*

10

*Mill, LLC*, 187 A.3d 797, 806 (Md. Ct. Spec. App. 2018) (internal citations omitted). Once an insured establishes that an injury is within the scope of coverage, the burden shifts to the insurer to establish that an exclusion removes the insurer's duty to indemnify, because where an insurer claims that an exclusion removes the insurer's obligation to indemnify the insured, the insurer bears the burden of showing that the exclusion applies. *Prop. & Cas. Ins. Guar. Corp. v. Beebe-Lee*, 66 A.3d 615, 624 (Md. 2013); *White Pine Ins. Co. v. Taylor*, 165 A.3d 624, 633–34 (Md. Ct. Spec. App. 2017).

## II.      Aspen's Motion for Judgment on the Pleadings

In its Motion, Aspen argues that because Defendants received a request for medical records relating to Terry, the plain language of the Aspen Policy demonstrates that there is no coverage for the Terry Action claims.  Specifically, Aspen invokes Exclusion F, the Medical Records Request Exclusion, which states that:

> Despite any other provision of this policy, this policy does not apply to any **claim** arising out of, based upon or attributable to, in whole or in part, or in any way involving . . . [a]ny **claim** or **suit** brought by a patient where, prior to the inception of this policy, a patient or a legal representative of a patient requested the patient's medical records from **you** or **your** medical practice.

Aspen Policy at 10–11. A "claim" is defined as "a demand for money or services received by you alleging an injury caused by an incident to which this insurance applies," and as "an incident that you report to us, which you reasonably believe may result in a demand for money or services." *Id.* at 21.

The Terry Estate's request for medical records was sent to MIVC on April 20, 2021, and as Dr. Dormu has acknowledged in a declaration attached to the Amended Counterclaim, MIVC staff issued a response to the request the next day, on April 21, 2021.  Because the Aspen Policy did not become effective until October 9, 2021, there is no insurance coverage for, and Aspen has

11

no duty to defend against, the claims asserted in the Terry Action based on the plain language of Exclusion F.

In seeking to escape this exclusion, Defendants argue that the Medical Records Request Exclusion applies "only if the medical record request was related to an injury that the insured had a reasonable basis to believe would reasonably result in a demand for money or services." Opp'n at 15, ECF No. 63. This claim fails because Exclusion F lacks any language that explicitly or implicitly includes an additional requirement that there be a reasonable basis to believe that the records request would lead to a demand for money, and the Court is not permitted to add terms to the contract which do not appear on its face and which are not obviously within the contemplation of the contracting parties. *See Cap. City Real Est.*, 788 F.3d at 379 ("If the policy's language is clear and unambiguous, the Court will assume the parties meant what they said.").

Nevertheless, Defendants argue that such language should be read into Exclusion F because many other provisions within the Aspen Policy use qualifying language relating to such a reasonable belief. For example, they cite Exclusion E, which immediately precedes Exclusion F, and provides that there is no coverage for a claim that involves "[a]ny incident which, prior to the inception of this policy, any insured had a reasonable basis to believe . . . might reasonably be expected to be the basis of a claim or suit against any insured." Aspen Policy at 11. This argument in unpersuasive because the fact that the Aspen Policy contains such language elsewhere only strengthens the conclusion that the failure to include it in Exclusion F means that it does not apply to that provision. Indeed, if the Court were to read Exclusion F to exclude claims based on a medical records request only if the insured had a reasonable basis to expect it to be the basis of a claim or suit, Exclusion F would not exclude any claims not already excluded by Exclusion E.

12

*Harleysville Preferred Ins. Co.*, 187 A.3d at 806 (stating that a court must "construe a contract as a whole and give effect to every clause and phrase").

Likewise, Defendants' reference to the part of the definition of "claim" that includes within that term "an incident that you report to us, which you reasonably believe may result in a demand for money or services," Aspen Policy at 21, is unconvincing. While this definition provides that an incident does not constitute a claim until the insured reports it to Aspen or has a reasonable belief that it may result in a demand, that limitation does not prevent the policy from excluding coverage if a medical record request was made in relation to that incident prior to the effective date of the Aspen Policy.

Finally, Defendants contend that without reading a reasonable belief qualifier into the Exclusion, the term of the Aspen Policy providing coverage for incidents based on medical services provided back to the retroactive date of October 9, 2007 would be rendered "effectively moot." Opp'n at 15. They note that because MIVC receives dozens of medical records requests each week for a variety of reasons, reading Exclusion F based on its plain language would effectively mean that there would be no coverage for numerous claims-based incidents arising from medical services provided after October 9, 2007. Maryland courts endeavor to give effect to all provisions of a contract, including exclusions, unless "the exclusion totally swallows the insuring provision." *Bailer v. Erie Ins. Exch.*, 687 A.2d 1375, 1380 (Md. 1997). However, the plain reading of Exclusion F does not eliminate all coverage for claims arising before the effective date of the Aspen Policy. Exclusion F does not exclude coverage for claims based on medical services provided before the effective date of the Aspen Policy when the initial medical records request is made after the start of the policy, and it does not exclude claims for which no medical records request was made by the patient or the patient's legal representative, or for which a medical

13

records request was made by someone else, such as another physician, who might seek the records for treatment purposes rather than pursuing a potential claim. Rather, Exclusion F, like Exclusion E, serves to limit, but not eliminate, the range of potential claims based on medical services provided before the effective date of the Aspen Policy, by excluding those that were apparently already in the investigative stage prior to the start of the Aspen Policy. Because there remains coverage for numerous claims arising from medical services provided before the effective date of the Aspen Policy, Exclusion F does render the retroactive date provision of the Aspen Policy meaningless or illusory.

Accordingly, under the plain language of Exclusion F, because the Terry Estate made a request for medical records to Defendants before the effective date of the Aspen Policy, that policy does not provide coverage for the Terry Action. Aspen's Motion for Judgment on the Pleadings will therefore be granted.

**III.    MedPro's Motion to Dismiss**

In its Motion, MedPro seeks dismissal of the Amended Third Party Complaint against it and asks this Court for a declaratory judgment that MedPro is not under a duty to defend or indemnify Defendants in the Terry Action. MedPro argues that because under the terms of the MedPro Policy, the "claim" was "first made" after the expiration of the MedPro Policy, MedPro has no duty to defend. Defendants argue that any of three separate documents constituted a "claim" relating to the treatment of Terry that is eligible for coverage under the MedPro Policy: (1) the Terry Action filed in Prince George's County Circuit Court on September 27, 2021, which was served on Dr. Dormu on or about October 12, 2021; (2) the Terry Medical Records Request sent by an attorney for the Terry Estate to MIVC on April 21, 2021; and (3) the Notice of Claim filed in the HCADRO on August 26, 2021.

14

### A.    The Terry Action

First, the Terry Action, filed in court on September 27, 2021, was clearly a "claim," but it was not a "claim first made" during the term of the MedPro Policy. MedPro Policy at 22. Under that policy, a claim was "first made" on "the date the Insured initially received the claim for damages." *Id.* at 23. Here, it is undisputed that Dr. Dormu did not receive a copy of the Terry Action until on or after October 12, 2021, the date that it was served at his residence and given to his brother. MIVC did not receive it until it was served on October 14, 2021. The MedPro policy period ended on October 9, 2021, three days before the earliest possible date on which one of the Insureds received the complaint in the Terry Action. Because that claim was not "first made" during the term of MedPro Policy, its filing does not provide a basis to find insurance coverage pursuant to the MedPro Policy. *Id.*

In arguing that the Terry Action is nevertheless subject to coverage under the MedPro Policy, Defendants point to the provision in the MedPro Policy stating that MedPro has no "duty to defend or pay damages . . . on a claim unless it was reported to the Company during the term of this policy or thirty (30) days thereafter," *id.* at 22, and note that it reported the claim within that 30-day period. This provision, however, does not alter the description of coverage as consisting of "any claim first made . . . during the term of this policy." *Id.* Rather, it imposes an additional restriction on coverage based on the date of the reporting of the claim to MedPro. Based on the principle that a court construing a contract should give effect to "each clause or phrase," *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 625 A.2d 1021, 1033 (Md. 1993), these provisions, when read together, provide that a claim must be "first made" during the term of the MedPro Policy *and* it must be reported to MedPro within 30 days of the end of the policy period. Therefore, because the Terry Action was not a "claim first made" during the policy period because it was not received

by Defendants until after that period ended, the filing of the complaint in the Terry Action does not provide a basis for coverage under the MedPro Policy.

**B.    Medical Records Request**

Defendants also argue that the April 20, 2021 Terry Medical Records Request constituted a claim made during the time period of the MedPro Policy because it threatens litigation. The MedPro Policy covers "any claim first made . . . during the term of this policy based upon professional services rendered," where a claim is "first made" on the date that "the Insured initially received the claim for damages." MedPro Policy at 22-23. The MedPro Policy defines a "claim" as "an express written demand for money as compensation for civil damages." *Id.* at 23. Defendants argue that the following language in the Terry Medical Records Request demonstrates that it qualifies as a "claim":

> If you do not produce the medical records requested by my office by close of business this week, my clients will take all appropriate legal action to enforce their rights under Maryland and federal law and hold you accountable for violation of the law. Moreover, please be on notice of possible litigation and your duty to preserve all documents (including electronic data, audit trails, etc.) concerning Ms. Terry *in addition to* your handling of our medical records request.

Terry Med. Records Request at 1. Defendants argue that because the letter references possible litigation in addition to and separate from potential legal action relating to the failure to produce the medical records, the Terry Medical Records Request constitutes a claim.

This argument fails because the cited language does not constitute "an express written demand for money as compensation for civil damages," as required to constitute a claim under the MedPro Policy. MedPro Policy at 23. The first sentence referenced above threatened legal action, which arguably could include litigation, to enforce legal requirements that a healthcare provider produce medical records in response to a valid request. It cannot be fairly read to constitute a demand for monetary damages "based upon professional services rendered" as required to be

16

covered by the MedPro Policy. *Id.* at 22. Read in context, the second sentence notified Defendants that there may be "possible litigation" separate from any dispute over the production of medical records for which document preservation is necessary. Terry Med. Records Request at 1. While this language arguably signaled to Defendants that there may be future litigation relating to their treatment of Terry, it plainly does not make any demand for civil damages, as required to constitute a "claim."

Defendants argue that the Terry Medical Records Request may be a "potential claim," which is defined under the MedPro Policy as "an incident which the Insured reasonably believes will result in a claim for damages." MedPro Policy at 23. There is a fair argument that the treatment of Terry could constitute a potential claim, whether based on Dr. Dormu's knowledge of the circumstances of that treatment when it occurred in August 2020, or based on the additional fact that the Terry Estate requested medical records in April 2021. Nevertheless, even if that incident met the definition of "potential claim," the MedPro Policy states that MedPro "shall have no duty to defend or pay damages . . . on a potential claim unless it was reported to the Company during the term of this policy and the report includes all reasonably obtainable information, including the time, place, and circumstances of the incident; the nature and extent of the patient's injuries; and the names and addresses of the patient and any available witnesses." *Id.* at 22. So unlike a "claim," which may be reported up to 30 days after the end of the MedPro Policy, a potential claim is eligible for coverage only if it was reported with this level of detail by October 9, 2021, the last day of the policy period. Defendants, however, acknowledge that they first reported the Terry Action to MedPro on October 19, 2021. Thus, even if the Terry Medical Records Request were deemed to have established a "potential claim," that determination would not provide a basis for a finding of coverage by the MedPro Policy.

C.    **HCADRO Statement of Claim**

Defendants further argue that they received a "claim" during the policy period based on the filing by the Terry Estate of a Statement of Claim against them with the HCADRO on August 26, 2021.  Under Maryland law, a patient seeking to file a medical malpractice claim for damage due to a medical injury must first file a Statement of Claim with the Director of the HCADRO. Md. Code Ann., Cts & Jud. Proc., § 3-2A-04.  Thus, the Statement of Claim would clearly qualify as a "claim" under the MedPro Policy.  As for whether it was "first made" during the policy period as required for coverage, which occurs when "the Insured initially received the claim for damages," MedPro Policy at 23, Defendants allege in the Third Party Complaint that "[u]pon information and belief, a copy of the Statement of Claim was mailed to MIVC's offices during the policy period," Am. Countercl. ¶ 84.  Under Maryland law, the Director of the HCADRO "shall cause a copy of the claim to be served upon the health care provider by the appropriate sheriff in accordance with the Maryland Rules."  Md. Code Ann., Cts. & Jud. Proc. § 3-2A-04(a)(1)(ii).  The Maryland Rules permit service by mailing.  Md. Rule 1-321(a).  The United States Supreme Court has stated that it is a "general working principle" that "there is a presumption of legitimacy accorded to the Government's official conduct," and that "clear evidence" is usually required to displace the presumption.  *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 174 (2004).  Thus, it is a plausible allegation that the HCADRO actually mailed the Statement of Claim to Defendants. Viewing the allegations in the light most favorable to the nonmoving party, the Court finds that it is also reasonable to infer that the Statement of Claim was mailed on or about August 26, 2021, and thus would have arrived within the policy period, which continued until October 9, 2021.

The issue is whether the Amended Counterclaim is properly viewed as alleging that the Statement of Claim was received by Dr. Dormu or MIVC.  MedPro correctly notes that "service"

18

and "receipt" are not the same. *See Lee v. State*, 632 A.2d 1183, 1188 (Md. 1993). Generally, however, it is reasonable to presume that a properly mailed letter "reached its destination at the regular time and was received by the person to whom it was addressed." *Kolker v. Biggs*, 99 A.2d 743, 746 (Md. 1953); *see Fed. Deposit Ins. Corp. v. Schaffer*, 731 F. 2d 1134, 1137 (4th Cir. 1984) (stating that "[t]his presumption is one not easily overcome" (citation omitted)); *Nelson v. Diversified Collection Servs., Inc.*, 961 F. Supp. 863, 869 n. 4 (D. Md. 1997) (stating that "there is a presumption of receipt when notice is mailed to the last known address"). This presumption is also implicitly reflected in Maryland Rule 1-321, which provides that "[s]ervice by mail is complete upon mailing." Md. Rule 1-321(a).

MedPro argues that such a presumption should not be applied here because Defendants should be able to state whether they actually received the Statement of Claim, but have not. However, even if Plaintiffs had specifically acknowledged that they cannot confirm that they received the Statement of Claim, such a statement would "not conclusively rebut the presumption of receipt." *Bock v. Ins. Comm'r of the State of Md.*, 581 A.3d 857, 862 (Md. Ct. Spec. App. 1990) ("Testimony that the addressee did not receive the letter does not conclusively rebut the presumption of receipt."); *see also Hartranft v. Encore Cap. Group, Inc.* 543 F. Supp. 3d 893, 903 n.3 (S.D. Cal. 2021) (noting that a declaration stating that the plaintiff did not recall receiving a notice does not necessarily dispute that the notice was actually received). In *Barnett v. Okeechobee Hospital*, 283 F.3d 1232 (11th Cir. 2002), the court held that the presumption that a claim sent in the mail was actually received by an agency was not rebutted by declarations of multiple officials stating that they did not receive the claim, including based on a review of the agency files, because the fact that the claim "was not among those records . . . does not mean that it was not received by the office." *Id.* at 1241. Rather, "a party's failure to uncover an item, which it was presumed to

have received, does not mean that it never received the item and does not rebut the presumption of delivery" since "[i]t could have simply been misplaced after receipt or even misfiled." *Id.* Such a conclusion is even more compelling when a mailing is addressed to an entity, such as MIVC, because "[a] court could not rely on the bare assertion of one member of the office that the mail was not received, since the mail might have been received by another." *Id.*; *see also Huizar v. Carey,* 273 F.3d 1220, 1223 n.3 (9th Cir. 2001) (holding that under the common law mailbox rule, "stating that the document isn't in the addressee's files or records . . . is insufficient to defeat the presumption of receipt").

Where the Court is required at this early stage to view the allegations in the light most favorable to the nonmoving parties, and particularly where the Statement of Claim was legally required to be sent to Defendants, the Court will not find that the presumption of receipt has been overcome even in the absence of specific assertions by Defendants that they received the Statement of Claim. Because Defendants have sufficiently alleged facts that would support an inference that the Statement of Claim was received within the MedPro policy period, and it is undisputed that they notified MedPro of the claim within 30 days of the expiration of the MedPro Policy as is required for a claim first made during the policy period, *see* MedPro Policy at 22-23, MedPro's Motion to Dismiss will be denied.

## CONCLUSION

For the foregoing reasons, Aspen's Motion for Judgment on the Pleadings will be GRANTED. MedPro's Motion to Dismiss will be DENIED. A separate Order shall issue.

Date:   September 15, 2023



THEODORE D. CHUANG
United States District Judge

20